Filed 5/15/15  P. v. Jackson CA3

## <u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C074150 |
| Plaintiff and Respondent, | (Super. Ct. No. SF118777A) |
| v. | |
| DAVON ARTHUR JACKSON, | |
| Defendant and Appellant. | |

In July 2012, a jury found defendant Davon Arthur Jackson guilty of second degree robbery of one victim (also finding he personally fired a gun during the commission of a robbery), and of assault with a firearm of another victim (finding he personally used a gun).  After denying a motion for a new trial, the trial court sentenced defendant to state prison in June 2013 to an aggregate term of 27 years four months (the details of which we address in the Discussion).  Defendant filed a timely appeal.

1

To reorder the contentions, defendant asserts the trial court committed reversible error in reopening voir dire after swearing the jury and alternates; there is insufficient evidence that he was the person who committed the offenses; the trial court erroneously denied the motion for new trial based on juror misconduct; he did not fire a gun during the commission of a robbery within the meaning of the enhancement statute; he cannot be punished separately for both gun enhancements; and the trial court erred in imposing sentence. The People concede the latter (though not defendant's proposed remedy). We shall affirm the convictions and remand for resentencing.

## FACTUAL BACKGROUND

The facts underlying the offenses are straightforward. It is the identification testimony on which we need to elaborate.

The robbery victim was at a park in Stockton in the late afternoon of August 28, 2011. He was sitting on a bench while his young daughter and niece played. Two young men approached him. They wore T-shirts as masks over their lower faces. One stood in front of him, placing a gun against the victim's temple and demanding his wallet. The other stood behind the victim. The victim stood up, saying he did not have any money. The gunman and his companion wrestled the victim to the ground on his back. The gunman pressed his weapon against the victim's neck. The victim surrendered his wallet.

A cabinetmaker (the victim of the firearm assault) was working on his girlfriend's rental property near the park, when he heard the screams of young girls. He looked in their direction and saw them running from the park, while two men were standing over a man on the ground. The two men had T-shirts pulled over their heads, revealing their torsos, and were rifling though the man's pockets. The cabinetmaker thought one of the men, who was wearing a dark T-shirt, was holding a knife to the victim's neck. The cabinetmaker grabbed a hammer and ran in their direction. The robbers ran off with him

2

in pursuit. The one who had held the object to the victim's throat looked back at his pursuer and fired a gun into the air.

The cabinetmaker ran over to the victim, who did not respond to his questions. The cabinetmaker returned to the rental property and told his girlfriend to call the police. He got into his truck and took off after the robbers. He caught sight of them walking down the street, and followed from a half-block back. The gunman kept looking back at him over his shoulder. After turning a corner, they started to run. The cabinetmaker stopped his truck at the corner. From about 100 feet down the block, the gunman stopped, turned around, and pointed the gun at the truck. He fired the gun, but did not hit either the cabinetmaker or the truck. Eventually, the two jumped a fence and evaded their pursuer.

The girlfriend gave her cell phone to the robbery victim to talk to 911. He apparently told the dispatcher that he had not seen the robbers' faces clearly because of the T-shirt masks, one of which was dark (although he did not remember at trial what he had said during the call).[1] One of the responding officers spoke with the victim, who was in a great deal of pain because the robbers had broken his elbow. Meanwhile, the other responding officer went in search of the robbers; he had received a report that they were both wearing white shirts. He saw two people resembling the description and made a U-turn, at which point the two men started to run off. When the officer at the park heard a report that the other responding officer was in pursuit of suspects, she left the park to join him.

The two officers captured one of the suspects and put him in the back of the patrol car. When the suspect heard a radio report of the description of another person under pursuit—wearing a white shirt and khakis—the captured suspect blurted out defendant's

---

[1] More on this topic will be described later.

3

name, said he was defendant's buddy, and offered to show the officers where defendant was staying. The police did not find any other young men matching the description of the robbers in the neighborhood.

The officers brought defendant's buddy back to the park for an infield identification; this was about 15 minutes after the robbery. The victim was certain the buddy was the unarmed robber. Returning to the park, the cabinetmaker told the officer that the gunman had braids about six inches long and was wearing a dark T-shirt. (The officer wrote in her report that the cabinetmaker said it was the *unarmed* robber who was wearing the dark T-shirt, which the cabinetmaker testified was wrong.) He also told the officers that he had not paid much attention to the unarmed robber's appearance and could not identify defendant's friend.[2]

In a police interview, defendant's friend admitted he had been to the park earlier in the afternoon, and defendant may have gone there separately as well before him. They were walking down the street after buying cigarettes when they saw a police car make a U-turn; defendant started running because he was a fugitive from his group home,[3] and the friend followed. The friend said defendant was staying with his (defendant's) father, and offered to provide the address.

In early October 2011, the cabinetmaker picked a short-haired picture of defendant as the gunman after viewing a lineup for 10 seconds. He recognized the eyes, nose, and shape of the face. The parties stipulated that defendant eventually was arrested later that

---

[2]  Because the cabinetmaker was unable to identify defendant's friend in juvenile court, delinquency allegations against him for the robbery were dismissed for insufficient evidence; it does not appear the robbery victim's identification was part of the record in that case. Defendant's friend did not testify at defendant's trial.

[3]  Defendant, who turned 16 the day after the robbery, was the subject of a delinquency placement for being a minor in possession of a firearm (a fact not shared with the jury).

4

month (avoiding the disclosure that he was found in custody on yet another unrelated charge).

At the preliminary hearing, the robbery victim identified defendant in court as the gunman. He had been able to see *only* the face of the gunman, and had not noticed his hair. He remarked several times on how similar defendant and his friend appeared,[4] to the point he was not now sure which one was the gunman. Both robbers had white masks. The cabinetmaker described defendant (in identifying him in court) as "look[ing] very similar" to the gunman, though with different hair.

At trial, the robbery victim again identified defendant as the gunman and his friend (from a photo) as the other robber. However, he once again testified that he found it hard to tell them apart. He was adamant both wore white shirts; if his 911 call had suggested otherwise, he had misspoken or the translator misinterpreted his description of the *robbers* as being dark. The cabinetmaker again identified defendant as the gunman. He explained his description of defendant at the preliminary hearing as "similar" meant only that his hair was different, "but the face . . . he's the one I saw in the lineup." He was not sure if defendant was still wearing a dark T-shirt when he was following him in the truck. He again admitted that he had not paid much attention to the unarmed robber with the "lighter" T-shirt.

An employee at defendant's group home had been transporting him to juvenile hall three days before the robbery. Defendant fled the car; he did not have a cell phone or any money with him. His hair for the two months he had been in the group home was either the same length as or slightly longer than it appeared at trial. The employee informed defendant's probation officer (who filed a violation of probation with the court

---

[4] The photos in the record demonstrate a general overall resemblance, both teens having clean-shaven rounded faces, round eyes, short hair, and similar eyebrows. We note the robbery victim was a middle-aged man of a different race.

the next day). Another group home employee estimated the length of defendant's hair when he was in the group home as a half-inch to an inch long, too short for braids or corn rows.

A stylist, testifying as an expert for the prosecution, stated that in her 20 years of experience she had never seen a man get "twisties" (short braids)—a popular trend—made with anything other than their own hair, or get hair extensions. The latter can cost $200 or more, take up to eight hours to attach, and need at least a half-inch of natural hair as a foundation. In her opinion, the length of defendant's hair at trial was too short for extensions.

## DISCUSSION

### 1.0 Defendant Is Foreclosed from Challenging the Error in Reopening Voir Dire

#### 1.1 Background

After the jurors and the three alternates took their oath and left the courtroom, the prosecutor stated, "I made the biggest brain fart. I meant to kick a [juror] off who said she could not be fair. . . . I totally forgot to kick her off. I'm begging the court to let me kick her off," adding, "she was basically going to vote not guilty even if she found him guilty."[5] The court responded that the prosecutor was "stuck with whoever you got at this point," because "[i]f we did that, we would have to do it for everyone every time they decide, gee, I forgot," acknowledging that "[the proposed juror] did have some answers."

After a few minutes of discussion of procedural matters, the bailiff interjected, "[B]efore we go off the record, I need to advise the bench—I meant to and forgot, it slipped my mind—[that] . . . I've always referred to [Juror No. 9] as my niece. . . . [She's] not [a] blood relative[] or related to [me] in any manner . . . ." When the court

---

[5] Surely on the record in front of a trial judge, counsel could have found a less puerile metaphor for his dereliction.

6

asked if this gave either party "cause" to "reopen" (a nonexistent standard, as we shortly explain) the prosecutor quickly responded affirmatively; defense counsel stated, "I don't have a problem with [that]" (it being unclear whether the antecedent was the relationship with the bailiff or the prosecution's request to reopen voir dire), adding that he wanted the court to allow him to excuse anyone else on the jury as well. Pointing out that jury selection would need to start over if the parties excused more jurors than the number of available alternates (three), the court agreed to "reopen given the twist there."

When the jury arrived for trial the next day, the court told them voir dire would resume. After confirming her relationship with the bailiff, the prosecutor asked one question of Juror No. 9: "[E]arlier you had said that you'd be inclined to vote not guilty no matter what the evidence because of [defendant's] age. I don't want to reopen that discussion, but what I'm wondering is would you be at all uncomfortable doing that, knowing that a close friend of yours is going to find out about that?" She said "No." Defense counsel did not have any questions. The prosecutor then excused the juror. Defense counsel thereafter excused two other jurors, before both parties passed for cause and the newly constituted jury took its oath.

1.2 Analysis

Apparently the trial court and parties were unaware of *People v. Cottle* (2006) 39 Cal.4th 246, which confirmed that in *1989* the Legislature eliminated a trial court's statutory authority to reopen voir dire for *any* reason. (*Id*. at pp. 249, 255, 258-259, citing Pen. Code, § 1089;[6] Code Civ. Proc., §§ 226, 231, subd. (d), 233, 234 [therefore not error to deny defendant's request to reopen].)

On the merits, defendant asserts the reopening of voir dire was a structural error implicating his protection from double jeopardy in some fashion and his right to a jury

---

**6** Undesignated statutory references are to the Penal Code.

trial, which requires reversal without a showing of prejudice. He further contends he may raise the issue on appeal because it was necessary to obtain his express personal waiver of these rights, and because the trial court lacked jurisdiction to reopen voir dire. As we disagree with the latter points, we conclude he is foreclosed from raising the merits of the issue on appeal.

Not only did defense counsel *not* object to the reopening of voir dire, his conduct affirmatively transformed a hearing on whether there was good cause to discharge a juror (§ 1089) for refusal to perform her duty of applying the court's instructions to the evidence at trial (a standard here arguably satisfied as a matter of law)—into renewed voir dire. Once defense counsel excused two other jurors for no reason at all, the proceeding indisputably became renewed voir dire. A defendant cannot challenge any defects in the process of selecting a jury that occurred through acquiescence or invitation. (*People v. Mata* (2013) 57 Cal.4th 178, 185 [consent should be implied when party fails to object and continues to participate in proceeding challenged on appeal (there, reseating an improperly challenged juror)].) Defendant is also incorrect that trial counsel's action or inaction cannot forfeit his rights; requesting a mistrial, or choosing whether or not to continue with a particular juror or jury, are not among the constitutional rights we deem to be so fundamental that a defendant's express personal waiver of these is necessary. (*Ibid*.) Defendant completely disregards *Mata*, even after the People cited it in their brief.[7]

Defendant's reliance on *Cowan v. Superior Court* (1996) 14 Cal.4th 367 to contend we must reach the issue because the trial court lacked jurisdiction is mistaken.

---

[7] Defendant does, however, raise "the futility of objecting" in his reply brief for the first time as an excuse from forfeiture/invited error. We do not give plenary attention to this claim (*People v. Elder* (2014) 227 Cal.App.4th 1308, 1315, fn. 9), and thus observe only that the facts do not support an assertion of this excuse.

8

*Cowan* involved a defendant who wanted to enter an express personal waiver of the statute of limitations in order to enter a plea to a lesser offense. The question was not whether the defendant's express personal waiver was adequate, as defendant seems to suggest. Rather, the court was focused solely on whether the statute of limitations involves a trial court's jurisdiction in the "fundamental" sense, i.e., the power to proceed because it has both personal and subject matter jurisdiction (the latter of which the parties cannot confer by consent). It concluded that the procedure in question was merely in excess of the trial court's jurisdiction, rather than one over which the trial court lacked fundamental jurisdiction. (*Cowan,* at pp. 373-374.) The trial court in the present case had fundamental jurisdiction over the parties and subject matter; its actions (to which defense counsel gave at least implicit consent) were simply in excess of the trial court's statutory authority[8] to conduct voir dire. As a result, defendant's objection on appeal to the erroneous procedure in the trial court is foreclosed and we do not reach the merits, beyond advising the prosecutor to refrain from requesting to reopen voir dire (and the trial court from granting such request) in the future for *any* reason after the jury has taken its oath—if there is an objection from defense counsel, this will embed reversible error.

## 2.0 The Identification Evidence Is Not Insufficient as a Matter of Law

Defendant understandably takes issue with the sufficiency of the evidence of his identity as the gunman, given the equivocal nature of the record. We conclude on close examination that ultimately this was a question of the weight to be given to the evidence of identity, rather than hold this to be one of the rare cases in which we may override a verdict of guilt because it did not have a rational basis.

---

[8] Although defendant complains of the lack of statutory authorization to reopen voir dire, a proper example of a lack of *fundamental* jurisdiction on the basis of statute would be an unlimited civil case brought in the wrong tribunal, or a limited civil case appealed to the wrong tribunal. (See *Ytuarte v. Superior Court* (2005) 129 Cal.App.4th 266, 274-275.)

There are two steps in reviewing the sufficiency of the evidence. We first resolve all explicit evidentiary conflicts in favor of the judgment, and presume all *reasonable* inferences in its favor. We then determine whether the evidence thus assembled is substantial. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633 (*Kuhn*).) In the latter part of our review, we do not blindly seize *any* supporting evidence to affirm the judgment; we do not exist merely to echo the findings of the trier of fact. (*Id*. at p. 1633.) The ultimate question is whether a reasonable person could have made the necessary finding of fact in light of the record as a whole. (*Ibid*.)

Although inferences may constitute substantial evidence in support of a finding, they must be the *probable* outcome of logic applied to direct evidence, not speculation or conjecture. (*People v. Herrera* (2006) 136 Cal.App.4th 1191, 1205; *Kuhn*, *supra*, 22 Cal.App.4th at p. 1633; *People v. Berti* (1960) 178 Cal.App.2d 872, 876.) Whether an inference rationally flows from the evidence is a question of law. (*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 44-45; *Berti*, *supra*, at p. 876.)

We begin with the red herring of defendant's lengthy emphasis on the conflicting evidence of white and black T-shirts. Though apparently the 911 transcription of his call described dark shirts, the robbery victim testified at both the preliminary hearing and at trial that the shirts were white, and that either he misspoke in attempting to convey that the robbers were dark-*skinned* or the 911 operator did not correctly perceive him. As for the Samaritan cabinetmaker, his perception of a dark shirt (regardless of whether the police attributed his description to the correct robber) could also be rationally reconciled with seeing the dark torsos of the two robbers in the heat of the moment. In any event, defendant fails to demonstrate how the color of the T-shirts plays any material part in the legal sufficiency of his identifications as the gunman. It is not as if either witness *relied* on the color of defendant's shirt to connect him with being the gunman in the crimes; this

10

was nothing more than a mere incidental detail to be considered in assessing the weight of the identifications.

Although the robbery victim's admitted inability to distinguish clearly defendant's appearance from that of his friend might in other circumstances fatally undermine any reliance on his identification of defendant as the gunman, on the present record it only confirms the accuracy of the identification. The victim had been focused *only* on the gunman, and not the other person standing behind him. Nevertheless, he identified defendant's friend 15 minutes later as one of the robbers; to the extent his confusion had any impermissible role, it was in incriminating the friend on the basis of his resemblance to the face at which the victim had been staring. Defendant has not posited any scenario under which the fact he resembles his friend renders insufficient as a matter of law the victim's subsequent identification in court of defendant as the face the victim had seen during the robbery (and had reaffirmed by the infield identification with a similar face shortly afterward). It is not as if there was an issue in this trial as to *which* of them was the gunman.

As there is a single witness on whom the jury's verdict can properly rest, we could stop our analysis here. (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614-615.) However, we do not find that reliance on the other identification would be so irrational that it would render the verdicts infirm, even if it were the sole basis for them.

The issue of hair extensions as an explanation for the cabinetmaker's observation of short braids was fair game for the jury's consideration, even without the expert's opinion on the matter. The parties called this consideration to the attention of the jury. An ability to alter one's appearance is a rational inference, not improper speculation. If a robber is described as having a mullet or a beard, a defendant lacking any similar antecedent or subsequent hirsute attributes is not exonerated of guilt; it is for the jury to decide the likelihood of disguise. It would only be where a change in appearance is so

11

unlikely to have been achieved under the circumstances that we would need to disapprove such an inference as irrational.

Although the expert stylist did not think defendant's hair at trial was long enough for extensions, she admitted that only a half-inch of hair was needed to attach them, and the witnesses from the group home established that defendant's hair had been longer than at trial, and in excess of this minimum. Furthermore, to the extent a woman of her experience was unaware of men who used extensions (as opposed to teens in defendant's age group), defendant had absconded from his group home and thus had a motivation to alter his appearance even if he were not inclined otherwise to do so. If defendant's father was willing to let him stay with him, it is rational to infer the father could also have arranged for the extensions to help keep his son from returning to his group home. This line of reasoning thus is a proper basis for crediting the cabinetmaker's identification of defendant with having longer hair at the time of the crimes.

In any event, the length of defendant's hair—like the color of the shirts—is in the end incidental to the weight of the identification. While the cabinetmaker distinguished *between* the robbers on the basis of defendant's hair length, he identified defendant as the gunman on the basis of *facial features*. Therefore, even if he saw braids that were not there, it is simply part of the jury's evaluation of the extent to which they should credit this identification.

We would not suggest this is the strongest quantum of evidence on the issue of identity. However, it is sufficient to convince us a rational trier of fact could have based a verdict of guilt on it. We therefore reject defendant's argument.

**3.0  Defendant Failed to Establish Jury Misconduct**

3.1  Criteria for Evidence of Jury Misconduct

We lay out the criteria for evidence of jury misconduct at the threshold because defendant largely overlooks them in his account of the record on this point. (Indeed, his

12

opening brief is replete with references to inappropriate evidence in the course of his argument.) A motion for new trial that is premised on jury misconduct involves one of the paradigmatic "three-step" analyses. The trial court must *first* determine the *admissibility* of evidence submitted with the motion. Only *then* does it determine if the facts in the admissible evidence establish a presumption of misconduct. Finally, it evaluates whether this presumption is rebutted, i.e., if it is not prejudicial. (*People v. Vigil* (2011) 191 Cal.App.4th 1474, 1483-1484.) Although ordinarily we review a trial court's determination on a motion for new trial for abuse of discretion, the finding of error—whether a presumption of misconduct arose—and the finding of whether the People rebutted it that underlie the ruling are the subject of our review de novo. (*People v. Collins* (2010) 49 Cal.4th 175, 242 & fn. 31 (*Collins*); *People v. Nesler* (1997) 16 Cal.4th 561, 582 & fn. 5.)

With respect to the initial step, only *otherwise admissible* evidence of *objectively ascertainable overt acts* is admissible as proof of jury misconduct; evidence of *subjective reasoning* is not—indeed, it is without any substantive "jural consequence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1261, 1264; *People v. Hill* (1992) 3 Cal.App.4th 16, 30 (*Hill*); Evid. Code, § 1150.) A trial court must be exacting in applying these criteria. (*Collins*, *supra*, 49 Cal.4th at p. 249.)

We review the admission of evidence of misconduct for an abuse of discretion (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345), which is established where a trial court does not apply the law correctly (*People v. Hume* (2011) 196 Cal.App.4th 990, 995). While parties generally may waive evidentiary objections to documents, it is not permissible to treat unsworn statements as though they had been made under penalty of perjury in order to attack a jury verdict for misconduct. (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1470.) As for the evidence submitted in support of the motion, it is not necessary for the prosecutor, as prevailing party, to obtain rulings on any objections

13

to evidence of subjective reasoning in order to renew them on appeal, given the absence of any evidentiary value as a matter of law. (*Hill*, *supra*, 3 Cal.App.4th at p. 33, fn. 5.)

Regardless of the evidence presented in the trial court, it is proper for us to limit our account of the record in this opinion to the *admissible* evidence. (*Collins*, *supra*, 49 Cal.4th at p. 250.)

### 3.2 Factual and Procedural Background

The jury deliberated for little more than one hour before tentatively announcing that it had reached a verdict, but asking whether there was a typographical error in a verdict form. (One of the enhancement verdict forms lacked the option of a negative finding.) After the trial court convened with the parties a couple of hours later to correct the form and resubmit it to the jury, the jury returned its verdicts within a few moments. Defendant filed a motion for new trial premised on the following facts, in which he contended there was misconduct during deliberations.

The prosecutor had introduced a photograph of defendant with a relative in which it looked as if defendant were making hand gestures associated with gangs (though for all it appears he could simply have been emulating a music video). The photograph includes the caption "ATK Shit Bout Cheese" and defendant's younger relative appears to be holding fanned slices of cheese in his hand, as one might display dollar bills. The exhibit was for the purpose of demonstrating defendant had short hair on September 5, 2011, just days after the crimes. As part of the stipulation regarding the exhibit that he read to the jury, the prosecutor admonished that "despite the hand gestures in there, there's no allegation of gang anything, no gang affiliation, no gang signs. . . . [I] didn't want anybody to think that there was any gang association at all with [defendant]."

A defense investigator spoke with Juror No. 2 after trial. In the investigator's *unsworn* statement attached to the motion relating *hearsay* statements, he said that during a phone conversation with the juror, the latter had subjective misgivings about much of

14

the trial. Bringing up the issue of the exhibit, the investigator asked (impermissibly) about any *effect* it may have had on the jury's deliberations; the juror's answer noted that it had been the subject of discussion. The investigator met with the juror in person, renewing the question about the exhibit. The juror again said "it was openly discussed by the jury for a short time," and added further subjective misgivings about finding defendant guilty. The juror agreed to send a letter to defense counsel.

This *unsworn* letter once again expressed the juror's subjective misgivings about the fairness of the trial. He also expressed the belief (unconnected with overt statements) that the exhibit "planted the seed . . . that [defendant] could indeed be a gang member" in "the other jurors," as well as himself.

The prosecutor filed written opposition to the motion. He asserted the evidence submitted with the motion was inadmissible. He also represented that he (and perhaps defense counsel) had spoken with all the jurors after trial to ask (impermissibly) about whether the exhibit may have had any *effect* on deliberations, at which time everyone shook their heads and the foreperson said that the jury had not considered it at all. For this reason, the prosecutor asserted that the juror's claim about discussing defendant's gang membership was not credible.

Six months later, the court held a hearing on the new trial motion. The trial court allowed defense counsel to call the juror as a witness without addressing the admissibility of the evidence submitted with the motion.

On the issue of any overt discussion of the exhibit (the sole cognizable element of his testimony),[9] the juror said, "it sort of like fueled the fire that [defendant] was a gang

---

[9] The parties questioned the witness at length about subjective thought processes without any objection from each other, or any intercession from the trial court. (*Collins*, *supra*, 49 Cal.4th at p. 249 [trial court must take great care in conducting hearing to keep within confines of admissible evidence on this issue].)

member.  I believe something was said about disregarding the hand gestures . . . , that they . . . may or may not be gang [gestures]."  He explained, "when I say, 'Fueled the fire,' . . . jurors were talking like he . . . could have had gang members . . . help him put dreadlocks on or take them off, or that was the discussion at the time, that most definitely he was a gang member if he's making gang signs, *even though nobody said*" (italics added), indicating this was his *interpretation* of the other jurors' comments.  When defense counsel asked if there had been more than one juror who stated defendant was a gang member, the juror vaguely replied, "there was considerable . . . conversation."

During his cross-examination (in which his evasiveness leaps from the reporter's transcript), the juror claimed to know what the other jurors were thinking on the subject of gang membership because "we talked about it"; however he admitted he was speculating that the other jurors voted guilty based on the photo exhibit, and "nobody specifically said" that " 'I think he's a gang member because I saw that photo.' "  The juror also conceded he did not say anything about this when speaking with the prosecutor after trial.  Finally, he mentioned that he learned during his face-to-face meeting with the investigator that defendant was facing a 30-year sentence.

In a brief redirect examination, the juror indicated "there was talk about the hand gestures, on what they were, what . . . they meant, what does the word 'cheese' mean. . . . And there was a lot of discussion about the photo.  And there was a lot of discussion about what a good ploy [the admonition] was" as a means for pointing out that defendant was a gang member "without specifically saying he was a gang member."  (The juror likened it to telling someone not to think about pink elephants.)  The parties then stipulated that the investigator's written statement was an accurate offer of proof of his testimony, in lieu of continuing the hearing (again) to call him as a witness.

During argument, neither party discussed the issue of admissibility of evidence (beyond the prosecutor, after focusing his argument on the juror's lack of credibility,

16

adding that there was a need for a stronger "foundation" before tossing out a verdict). In denying the motion, the court remarked, "I don't think I'm going to overturn it on the basis of what [the juror] has told," alluding (in a link unclear to us) to the juror basing his vote on the certitude of the other jurors (an inadmissible fact). The trial court then said, "society the way it is now, it talks somewhat about gangs, but not be unusual [*sic*]. [¶] We . . . I would be more concerned if we didn't [give the admonishment with the exhibit]. [¶] We did tell them that and I assume they followed the . . . instructions . . . and didn't speculate . . . ." The court did not expressly discuss the admissibility of the submitted evidence, or the credibility of the juror's testimony (which, if indeed credited, would belie its reliance on the presumption jurors follow a court's instructions). (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1119 [evidence of disregard of one instruction belies presumption otherwise].) However, given our de novo review of the issue, the adumbrative nature of this reasoning need not concern us.

3.3 Analysis

A trial court should conduct an evidentiary hearing only if defense counsel has produced "evidence demonstrating a strong possibility that prejudicial misconduct has occurred." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.) The meager showing in the unsworn and hearsay accounts submitted with the motion hardly seems to satisfy this standard. "Unsworn statements cannot be used to establish juror misconduct" (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1043), nor can hearsay statements (*ibid*.; *People v. Williams* (1988) 45 Cal.3d 1268, 1319 & fn. 5 [further suggesting in the footnote that a trial court should not conduct an evidentiary hearing based on such evidence].) The trial court thus arguably committed an error of law in basing its decision to hold a hearing on the "evidence" before it, which accordingly was an abuse of discretion. Therefore, its denial of the motion on the merits could not have prejudiced defendant.

17

In any event, the *overt* evidence on the issue is limited to juror statements that defendant was a gang member based on his appearance in the photo exhibit, and that gang cohorts may have assisted him in disguising his usual appearance.  But "prejudice" from gang membership arises only where it is a basis for a finding of guilt *in lieu of* the evidence at trial.  (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.)  Defendant failed to supply any evidence to this effect.  Indeed, as noted above, the juror admitted that there was at least one comment heeding the admonition *not* to consider gang evidence ("I believe something was said about disregarding the hand gestures").  As the trial court appeared to be indicating, in the present day it is impossible to prevent *some* speculation about gangs in the course of  a criminal jury's deliberations, but providing an admonition is expected to counteract any casual conversations about the subject actually playing any part in finding a defendant guilty.  (*People v. Avila* (2009) 46 Cal.4th 680, 727 [transitory discussion of impermissible subject generally innocuous, especially where reminders from jurors of prohibition on discussion].)  As for the jurors possibly discussing any assistance from gang members as *one* possible explanation for the apparent change in defendant's appearance, this does not mean the jury premised its chain of reasoning on this taboo topic; the evidence does not include any statements that *only* gang affiliation could explain this inconsistency in the identification, as opposed to assistance from any others in defendant's circle, or the father with whom he was staying.  Consequently, on independent review of the limited amount of overt evidence in the equivocal testimony of the penitent juror, we agree that defendant failed to establish prejudice.

**4.0  Defendant Fired a Gun During the Commission of the Robbery**

Just before closing arguments, the court granted the prosecutor's motion to amend the information to allege an enhancement pursuant to "section 12022.53[, subdivision] (c)" for the count of robbery, and pursuant to "section 12022.5[, subdivision] (a)(1)" for the count of firearm assault.  The jury was accordingly instructed as to the former that,

18

"you must . . . decide whether . . . defendant personally and intentionally [fired] a [gun] during [a robbery] . . . . [¶] To prove this allegation, the People must prove that . . . defendant personally [fired] a [gun] during the commission of the crime," and that the commission of a robbery continues until the robbers reach a place of temporary safety. It received a verdict form asking it to "find that in the commission . . . of the above offense, . . . defendant personally used a firearm . . . within the meaning of . . . section 12022.53[, subdivision] (c)." As noted above, the jury sustained this allegation.

On appeal, defendant concocts from whole cloth a requirement that firing a gun at a pursuer does not occur "during the commission" of a robbery unless the pursuer has the status of a victim with a possessory interest in the proceeds. This is not the law.

"A [gun] use enhancement attaches to an offense, regardless of its nature, if the [gun] use aids the defendant in completing one of its essential elements." (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1012.) A defendant can use a gun within the meaning of one of the use enhancements against a person *other than* the victim of a robbery. (*People v. Fierro* (1991) 1 Cal.4th 173, 226-227 ["immaterial" whether gun personally used at time of taking or against actual robbery victim, thus fatal shooting of another to facilitate escape is personal use during commission of robbery]; *People v. Granado* (1996) 49 Cal.App.4th 317, 320-321, 330 [personal use of gun to keep one attempted robbery victim frozen in place while cohort pursues other attempted victim occurs in the commission of both attempted robberies], cited with approval in *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1197-1200 [personal use of knife enhancement applied to all four counts of attempted murder regardless of whether victims actually saw knife, were simply made aware of its use, or were unaware of it].)

Defendant's untenable construction would lead to a result that would allow the robbers fleeing from a bank to shoot at their police pursuers without fear of increased punishment for personally firing their guns. Indeed, in his reply brief, defendant gives

19

acknowledgement that at least *Hajek and Vo* is contrary to his analysis. We therefore reject this argument.

**5.0  Section 654 Does Not Apply to the Two Enhancements**

Defendant argues the criteria of section 654 preclude his punishment for both of the gun use enhancements, contending that they are both based on the same gunshots. Whatever the merits to this claim in the abstract, it disregards controlling law antedating his briefing.

"Section 654 precludes multiple punishment where an act or course of conduct violates more than one criminal statute but a defendant has *only* a single intent and objective." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.) If the statute applies, the trial court must impose sentence but stay execution on all convictions except the one carrying the longest sentence. (*Ibid*.) We review explicit or implicit factual resolutions *of the trial court* for substantial evidence in the trial record, which the court may base on any facts in the record without regard to the verdicts unless the verdicts foreclose the consideration of them in some fashion. (*Id*. at pp. 1338, 1340.)

When applied to multiple enhancements of the same "aspect" of a *single* offense, section 654 precludes punishment for more than one of them. (*People v. Ahmed* (2011) 53 Cal.4th 156, 163, 165.) However, if section 654 does not bar multiple punishment for *multiple* underlying offenses, it cannot bar punishment for the enhancements attached to each of the offenses even if they are of the same nature. (*People v. Wooten* (2013) 214 Cal.App.4th 121, 130.)

Defendant does not contend that section 654 precluded punishment for both a firearm assault and a robbery of separate victims. The statute therefore does not apply to the enhancements in this case, and we consequently do not need to consider the substance of defendant's application of its criteria to them. We thus reject this argument.

20

**6.0 The Trial Court Imposed the Wrong Enhancements**

Unaccountably (without objection from either party), at sentencing the trial court imposed the enhancements charged in the original information rather than as amended (no doubt because almost a year had passed since the amendment). Thus, on the principal term the court imposed an enhancement for personally *firing* a gun during a firearm assault (§ 12022.53, subd. (c) [20 years]) rather the simple *use* enhancement that the jury had sustained (§ 12022.5, subds. (a) & (d)), and an enhancement for personal *use* of a gun during the commission of a robbery (§ 12022.53, subd. (b) [10 years]) instead of personally *firing* a gun during the commission of a robbery for the subordinate term.[10]

The People properly concede that defendant correctly maintains there is a need to remand for resentencing on the proper enhancement to the conviction for firearm assault (defendant noting that the enhancement under section 12022.5, subdivision (a) involves a sentencing triad, and the record does not give any indication about the term the trial court would have selected had it been aware of this sentencing choice). As for the robbery enhancement, defendant appears to assert that there is a defect in the verdict form that limits it to personal *use* of a gun during a robbery rather than personally *firing* a gun during a robbery. This latter point, even if not forfeited as a "lurking" argument unrelated to the heading (see *Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10), is incorrect.

Defendant's failure to raise an objection in the trial court to the form of the verdict forecloses any argument on appeal premised on any purported defects. (*People v. Jones* (2003) 29 Cal.4th 1229, 1259; *People v. Bolin* (1998) 18 Cal.4th 297, 330; *People v. Webster* (1991) 54 Cal.3d 411, 446.) The verdict form for the enhancement did not omit any element such that defendant could assert a violation of due process on appeal.

---

[10] The clerk's minutes and the abstract of judgment note the section numbers for the *correct* enhancements, with the *incorrect* sentences.

As long as the verdict form reflected the jury's intention to sustain the enhancement described in the statute (as alleged in the amended information) and defined in the instructions, this was sufficient.  (*People v. Paul* (1998) 18 Cal.4th 698, 706-707; *People v. Mackabee* (1989) 214 Cal.App.3d 1250, 1256.)  Accordingly, the trial court may properly impose the mandated one-third of the 20-year enhancement of the subordinate term on remand.

## DISPOSITION

The convictions of guilt are affirmed.  The sentence is vacated and remanded for determination of the term for the proper enhancement to the conviction for firearm assault.  Upon resentencing, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


                                                    BUTZ                    , J.



We concur:


      NICHOLSON      , Acting P. J.


      RENNER         , J.


22